**ORIGINAL**

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

OFS FITEL, LLC, and
OFS BRIGHTWAVE, LLC,          )
                             )
          Plaintiffs,        )
                             )
     v.                      )   CIVIL ACTION
                             )   FILE NO. _____ 2005CV107111
EPSTEIN, BECKER & GREEN,     )
P.C.                         )
          Defendant.         )

### SUMMONS

**TO THE ABOVE NAMED-DEFENDANT:  Epstein, Becker & Green, P.C.**

You are hereby summoned and required to file with the Clerk of said court and to serve upon the Plaintiff's Attorney, whose name and address is:

> Jeffrey O. Bramlett
> David G.H. Brackett
> BONDURANT, MIXSON & ELMORE, LLP
> 3900 ONE ATLANTIC CENTER
> 1201 WEST PEACHTREE STREET, N.W.
> ATLANTA, GEORGIA 30309-3417
> (404) 881-4100

an answer to the complaint which is herewith served upon you, within (30) days after the service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This ___ day of ___October___, 2005.

_____
Deputy Clerk

To Defendant upon whom this petition is served:

This copy of complaint and Summons was served upon you _____ 2005.

_____

100696

**ORIGINAL** IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

OFS FITEL, LLC, and                        )
OFS BRIGHTWAVE, LLC,                        )
                                           )
          Plaintiffs,                      )
                                           )     CIVIL ACTION
     v.                                    )     FILE NO. _2005CV107111_
                                           )
EPSTEIN, BECKER & GREEN,                    )
P.C.                                       )
          Defendant.                       )

## COMPLAINT

Plaintiffs OFS Fitel, LLC and OFS BrightWave, LLC (collectively "OFS") bring this

action to recover damages and allege the following:

### Preliminary Statement

This is an action for legal malpractice, breach of fiduciary duty, and unjust enrichment.

Epstein Becker & Green ("EBG") holds itself out as one of the world's largest labor and

employment law practices with special expertise in working with foreign employers doing

business in the United States "in navigating the rough seas of U.S. labor and employment law"

and avoiding employment litigation.  EBG was hired by OFS' Japanese parent to provide this

special employment law expertise for the benefit of OFS in a 2001 business transaction with

Lucent Technologies.  EBG undertook professional responsibility for guiding OFS to comply

with American employment law in the course of acquiring business units managed by a highly

skilled managerial workforce located in Norcross, Georgia.  Despite charging $1.2 million for its

legal work, EBG negligently failed to advise OFS of the serious legal risks and potential lawsuit

consequences under America's Age Discrimination in Employment Act ("ADEA") of a planned

course of action in which younger workers received more generous severance than their older counterparts. When older workers brought ADEA claims and lawsuits against OFS, EBG compounded the harm done by its negligent advice by turning its back on its former client and breaching its fiduciary duties. In this action, OFS seeks legally recoverable damages and disgorgement of EBG's excessive fee.

### The Parties

1.

Plaintiff OFS Fitel, LLC is a Delaware limited liability company and a wholly-owned second-tier subsidiary of The Furukawa Electric Co., Ltd. ("Furukawa") with its principal place of business in Norcross, Georgia.

2.

Plaintiff OFS BrightWave, LLC is a Delaware limited liability company and a wholly-owned second-tier subsidiary of Furukawa with its principal place of business in Norcross, Georgia.

3.

Epstein, Becker and Green, PC ("EBG") is a 375+ lawyer law firm operating and doing business through eleven different offices across the United States, including an office located at 945 East Paces Ferry Road, Suite 2700, in the City of Atlanta, Fulton County, Georgia. EBG is organized as a professional corporation under New York law. EBG is registered to do business in the State of Georgia and may be served by service upon its Registered Agent, H. Mairine Hicks at its registered address, 945 East Paces Ferry Road, Suite 2700, Atlanta, Georgia 30326.

### Jurisdiction and Venue

#### 4.

This Court has personal jurisdiction over the Defendant.

#### 5.

This Court has jurisdiction over the subject matter of this action.

#### 6.

Venue is proper in this Court.

### The Lucent Transaction

#### 7.

In 2001, Lucent Technologies offered its Norcross-based fiber optics business unit for sale.

#### 8.

Furukawa, a Japanese company with limited prior business experience in the United States, entered into an agreement with CommScope, Inc., a publicly-traded U.S. company, to pursue the acquisition of the fiber optics business unit Lucent wished to sell. In July 2001, Furukawa entered into a contract with Lucent to pay $2.525 billion for the fiber optics business unit for the benefit of two new entities to be formed as a result of the transaction: OFS Fitel and OFS BrightWave.

#### 9.

Among the key assets of the fiber optics business unit was a recruited, trained, and in-place U.S. workforce of approximately 6,300 skilled people led by several hundred employees with management responsibilities in the Norcross, Georgia headquarters.

10.

EBG holds itself out as one of the largest and most skilled employment law practices in the United States. Among the advertising claims EBG makes about its expertise in providing employment law services are the following:

- The depth of the firm's capabilities and the experience of our attorneys enable us to handle complex and challenging employment law issues for clients on a worldwide basis.

- [I]n addition to representing employers in labor and employment litigation, EBG also offers preventative counsel and management training in all manner of human resource issues. This partnering effort with clients to avoid costly litigation helps to ensure that potential problems are handled effectively by management before they develop into disruptive litigation . . ..

- EBG also works closely with company executives, in-house counsel, and human resources departments on preventative measures that help protect against workplace problems before they occur.

- For employers of all sizes, business is global. But operating internationally is particularly challenging in the employment law context, as new levels of regulation expose employers to new varieties of liability and risk. There is likely no employment law firm in the world with more experience in working with multinational employers than EBG.

- Foreign corporations with operations in the United States face special challenges with respect to the laws governing the workplace.

4

- EBG's International Labor and Employment practice assists international companies in navigating the rough seas of U.S. labor and employment law.

11.

Because of Furukawa's limited prior business experience in the United States and its business objective to ensure that its initial $2.5 billion investment in the U.S. market be conducted in a manner conducive to further growth, investment, and prosperity in the United States, the business decision-makers acting on behalf of Furukawa in the Lucent transaction were charged with the directive to make sure that the acquisition and operation of the fiber optics business unit for the benefit of OFS was done in compliance with U.S. law. Furukawa insisted on protecting OFS from legal risk in the form of employment claims and lawsuits and ensuring OFS compliance with U.S. employment law were communicated to EBG. EBG accepted professional responsibility for effectuating these objectives.

12.

Furukawa selected EBG as labor and employment counsel in the 2001 transaction with Lucent because of: (1) EBG's vaunted special expertise in assisting international companies entering U.S. markets comply with U.S. labor and employment law and in providing sound counsel to minimize legal risks and to prevent expensive and damaging litigation over workplace issues; and (2) the existence of EBG's Atlanta office in close proximity to the fiber optics division's headquarters in Norcross.

13.

As initially conceived, CommScope, with its experience in operating a U.S. cable business, was to play the lead role for the joint venture in bringing this major acquisition to closure. However, in the wake of September 11, 2001 and a dramatic slide in the market for telecommunications, CommScope's financial position rapidly deteriorated. As a result, CommScope scaled back its participation in the joint venture and eventually relinquished its position in the joint venture to Furukawa.

14.

Because of the sudden and unexpected weakness in its joint venture partner, Furukawa was forced to assume the lead role in this major U.S. transaction. Ron Green, head of the EBG employment law team, addressed Furukawa's concerns over its ability to complete the transaction and operate the business in compliance with U.S. law in the absence of a seasoned U.S. joint venture partner by writing an October 2, 2001 memo confirming the scope of EBG's professional undertaking and containing the following assurances:

- [T]he attorneys at Epstein Becker & Green are most certainly prepared to provide whatever advice and resources necessary to assist . . . Furukawa business representatives.
- We are immediately working to prepare a memorandum addressing the contingency of going forward without CommScope in the areas of labor, employment and benefits, with attention to the business and operating practicalities associated with this possible conversion.

6

15.

CommScope's financial difficulties delayed the closing originally scheduled for September 2001. Ultimately, CommScope relinquished its entire position in OFS to Furukawa. The deal finally closed on November 16, 2001.

16.

As part of the transaction, OFS BrightWave, LLC was formed to hold and operate the optical fiber cable side of the business. OFS Fitel, LLC was formed to hold and operate the optical fiber side of the business. The legal services EBG performed were performed for the benefit of these OFS entities and they were and are the real parties in interest in this attorney-client relationship.

17.

During the course of this attorney-client relationship, EBG billed and collected in excess of $1.2 million for discharging its professional responsibilities to protect and to advance OFS' interests.

**The "Double Dip" Issue**

18.

EBG's primary professional responsibility in the transaction was to provide sound employment law advice and counsel on the conversion of Lucent's workforce to OFS, including Lucent's Norcross-based managerial employees. EBG assumed professional responsibility for helping OFS to accomplish this workforce conversion in accordance with U.S. law, including laws prohibiting discrimination on the basis of age.

19.

Lucent's Norcross-based managerial employees enjoyed a benefits rich compensation package, including a generous defined benefit pension plan, a voluntary early retirement option ("VRO") for workers whose combined years of age and years of service made them eligible for a service pension ("the Service Pension Eligible" or "SPE Group"), and a variety of other benefits – including severance and paid vacation – that became more generous as the employee's service credit increased.

20.

Under the terms of the deal, OFS assumed no liability for Lucent's existing pension obligations, including pension obligations to the SPE Group under the VRO. This fact, coupled with the usual anxieties and uncertainties attendant upon any change in ownership and control – and the transition to a foreign company in particular – threatened to undermine morale and stability in the workforce.

21.

On September 4, 2001, EBG's Messrs. Pianko and Roberts met with the Furukawa team to discuss "retiree and benefits." (The interaction between retirement and benefits came to be known among those working on the transaction as the "double dip" issue). The issue under consideration was whether OFS was legally required to bear the cost giving OFS employees in the SPE Group (*i.e.*, those that were service pension eligible with Lucent) the opportunity to "double dip" by: (a) taking VRO from Lucent; and (b) inflating their benefits entitlements by receiving full credit for their years of Lucent service from OFS. EBG undertook responsibility for evaluating whether U.S. law generally, and the ADEA in particular, permitted OFS, as the future employer, to treat the SPE Group as new hires for OFS benefits purposes, while giving

full credit for Lucent service to the younger employees whose age and years of service were

insufficient to trigger service pension eligibility.

22.

EBG proceeded to research the age discrimination implications of the "double dip" issue.

23.

Messrs. Pianko and Roberts were present in Norcross for extended meetings with

transaction participants on September 5.

24.

On September 6, as Messrs. Pianko and Roberts continued to meet with the "Furukawa

team" in Norcross, EBG's J.P. Barry recorded 6.8 hours performing the following work:

> "Confer with A. Roberts regarding provisions concerning hiring status of former
> employees who are retired per pension plan and impact on those who 'voluntarily'
> and 'involuntarily' retire; conduct legal research concerning age discrimination
> issues associated with same, include disparate treatment, disparate impact, and
> pattern and practice claims; multiple conferences with A. Roberts re: findings;
> forward cases to A. Roberts."

25.

On September 7, EBG's Barry continued his research into "viability of disparate impact

age discrimination claims" and again reported to Alan Roberts.

26.

On September 10, Messrs. Roberts and Pianko billed Furukawa for conferring "regarding

ADEA analysis" and Mr. Pianko commenced work on "the Q's & A's."

27.

The Q's & A's are a series of questions and answers drawn, finalized and circulated by

EBG's Mr. Pianko to communicate OFS' plans and intentions for the conversion of the Lucent

workforce to OFS.

28.

Based on EBG's employment law advice, Q's & A's on the "double dip" issue were initially communicated to Lucent's managerial employees through the September 19, 2001 memo attached as Exhibit 1B.

29.

Based on EBG's employment law advice, Q's & A's covering a broader range of workforce conversion subjects, including the "double dip" issue, were posted on the Lucent intranet website in the form attached as Exhibit 1C.

30.

The foregoing Q's & A's evidence EBG's conclusion that OFS could permissibly treat the SPE Group less favorably than younger workers for service credit driven benefits purposes. The Q & A committing OFS to undertake this course states:

> Q:    (OFS)  If I stay with OFS Brightwave or OFS Fitel, will my years of service be transferred to the new company?
>
> A:    For management employees, service recognition is based on whether or not an individual is able to commence a pension.  If a person's pension commences, then years of service will begin day one with the new company.  If a person's pension does not commence, then service time will be transferred to the new company.

Exhibit 1C at 21 of 26.

31.

In November, EBG drafted separate "offer letters" for OFS to present to two distinct groups of Lucent managerial employees: (a) those who were non-SPE eligible (Exhibit 1D-1); and (b) those who were SPE eligible (Exhibit 1D-2).  These offer letters contemplate that OFS will impose disparate and less favorable treatment on the older SPE-eligible workers with respect to benefits, including severance and paid vacation.

32.

These offer letters were drafted by EBG lawyers in the November 7-12, 2001 timeframe. They further evidence EBG's advice and counsel that this disparate treatment of the older SPE-eligible workers was legal and appropriate under U.S. employment law.

32.

At no time did EBG warn OFS or Furukawa that disparate treatment of SPE eligible employees on the "double dip" issue constituted an actual or potential violation of the ADEA.

33.

At no time did EBG warn OFS or Furukawa that OFS could be subject to viable or potentially viable claims or lawsuits under the ADEA if OFS proceeded to act in accordance with the Q's & A's communicated to Lucent's employees on the "double dip" issue.

34.

At no time did EBG warn OFS or Furukawa that OFS could be subject to viable or potentially viable claims or lawsuits under the ADEA if OFS proceeded to act in accordance with the "offer letters" drawn by EBG promising disparate treatment in service credit to SPE eligible employees relative to non-SPE eligible employees.

**OFS Suffers Lawsuits and Expensive Settlements for Following EBG's Advice**

35.

In the months following OFS' purchase from Lucent, the fiber optics business plummeted.

36.

Faced with falling demand for its products and large losses, OFS was saddled with the unpleasant necessity of laying off employees based in its Norcross office.

37.

Among those who were laid off were non-SPE employees, whose severance packages were calculated based on service credit tacked from their tenure at Lucent pursuant to EBG's advice.

38.

SPE Group employees suffered layoffs, too. However, because OFS followed EBG's legal advice on the "double dip" issue and acted in accordance with the Q's & A's and the "offer letters" drawn by EBG, when members of the SPE Group were terminated, they received sharply reduced severance and other benefits that were calculated without giving credit for Lucent service.

39.

OFS promptly encountered charges of ADEA violations and threats of litigation from severed SPE eligible employees who received disparate treatment and reduced severance and other benefits.

40.

OFS was forced to retain counsel approved by its insurer to analyze and defend these claims. Based on the legal judgment of its defense counsel and other independent counsel, OFS became concerned that EBG's advice on the "double dip" issue was wrong and OFS' position was legally indefensible.

41.

OFS contacted EBG for help. OFS asked EBG, specifically Allen Roberts, what legal support EBG had for the legality of the position on the "double dip" issue reflected in the Q's & A's and the offer letters. OFS pointed out that EBG's assistance in providing an "advice of

counsel" defense – if one were properly available – would mitigate the harm and exposure flowing to OFS from EBG's advice, even if erroneous. In response to this request for help in understanding the basis of EBG's prior advice, EBG declined to lift a finger to help its former client out of a predicament created by following EBG's advice unless paid to do so.

42.

OFS was facing claims for compensatory damages measured by the difference between the severance and other benefits actually paid in the amounts that would have been due the SPE Group employees had they received the same credit for prior Lucent service as their younger counterparts.

43.

In addition, OFS faced liability for attorneys' fees and expenses of litigation for successful plaintiffs and because the ADEA violation was so egregious, OFS was facing liquidated double damages for willful violation.

44.

OFS successfully avoided litigation by resolving two individual claims for approximately $250,000.

45.

OFS was served with a putative collective action in which 29 former SPE Group employees elected to join as plaintiffs.

46.

Facing its own mounting legal expenses and exposure in excess of $3 million, OFS prudently compromised the ADEA collective action by paying the sum of $1.9 million. These payments, coupled with approximately $450,000 in legal fees OFS incurred to defend itself in

these claims triggered by following EBG's erroneous advice establish compensatory damages of approximately $2.6 million.

**COUNT ONE**

**LEGAL MALPRACTICE**

47.

Plaintiffs hereby incorporate and re-allege the allegations contained in paragraphs 1 through 46.

48.

EBG formed an attorney-client relationship with OFS when it undertook the professional responsibility to guide OFS and its predecessor-in-interest through the workforce conversion aspects of the Lucent transaction in compliance with United States employment law generally and the ADEA, in particular.

49.

EBG breached the standard of care in the performance of its professional responsibilities to OFS by:

(a)   providing substandard and erroneous advice on the "double dip" issue evidenced by the Q's & A's and offer letters EBG lawyers produced and advised OFS to circulate to the workforce;

(b)   failing to advise OFS of the illegal policy posted in its website personnel guide when it provided post-closing advice on employment law compliance; and

(c)   failing to warn OFS of the legal risks, including claims and lawsuits under the ADEA, associated with acting in accordance with EBG's Q's & A's and offer letters.

50.

Pursuant to O.C.G.A. § 9-11-9.1, the Affidavit of Nancy Refuse is attached hereto as Exhibit 1.

51.

As a result of complying with Epstein, Becker and Green's erroneous legal advice to credit the prior Lucent service of younger employees, but not older ones, for benefits purposes, OFS has incurred compensatory damages of approximately $2.6 million.

## COUNT TWO

## BREACH OF FIDUCIARY DUTY

52.

Plaintiffs hereby incorporate and re-allege the allegations contained in paragraphs 1 through 51.

53.

EBG, in undertaking an attorney-client relationship with OFS, owed fiduciary duties to OFS.

54.

EBG breached its fiduciary duties owed to the plaintiffs.

55.

The Plaintiffs suffered harm proximately caused by the foregoing breach of fiduciary duties.

56.

By reason of the foregoing, the Plaintiffs are entitled to recover damages in an amount to be proven at trial.

## COUNT THREE

## UNJUST ENRICHMENT

### 57.

Plaintiffs hereby incorporate and re-allege the allegations contained in paragraphs 1 through 56 above as if fully set forth herein.

### 58.

EBG has been unjustly enriched to the detriment of the Plaintiffs by obtaining fees and expenses in the approximate amount of $1.2 million for defective, unskillful, and harmful legal advice.

### 59.

Accordingly, EBG should be required to disgorge some or all of the fees EBG collected for its failure to provide legal services of the quality and character EBG undertook to render.

## COUNT FOUR

## ATTORNEYS' FEES

### 60.

Plaintiffs hereby incorporate and re-allege the allegations contained in paragraphs 1 through 59.

### 61.

EBG has acted in bad faith, has been stubbornly litigious, and caused Plaintiffs unnecessary trouble and expense.  Therefore, Plaintiffs are entitled to an award of their costs and fees (including attorneys' fees) pursuant to O.C.G.A. §13-6-11.

127729

16

## COUNT FIVE

## PUNITIVE DAMAGES

### 62.

Plaintiffs hereby incorporate and re-allege the allegations contained in paragraphs 1 through 61.

### 63.

Plaintiffs are entitled to recover punitive damages from the Defendant because the conduct of the Defendant as alleged above was willful, wanton and evidences that entire want of care as would raise a presumption of conscious indifference to consequences.

### 64.

Plaintiffs are also entitled to recover unlimited punitive damages from Defendant pursuant to O.C.G.A. § 51-12-5.1(f) because the conduct of this Defendant, as alleged above, evidences specific intent to cause harm to Plaintiffs.

WHEREFORE, Plaintiffs demand the following relief:

(a)  That the Court enter judgment in favor of the Plaintiffs on Counts I, II, III, IV and V;

(b)  That the Court award Plaintiffs general and compensatory damages and punitive damages in amounts to be determined at trial;

(c)  That the Court award Plaintiffs their costs and expenses of litigation (including attorneys' fees); and

(d)  That the Court award Plaintiffs such other and further relief to which they are entitled.

## Jury Demand

Plaintiffs demand a trial by jury on all issues of fact and damages in this action.

This 4th day of October, 2005.

Jeffrey O. Bramlett
Georgia Bar No. 075780
David G.H. Brackett
Georgia Bar No. 068353

**BONDURANT, MIXSON & ELMORE, LLP**
3900 One Atlantic Center
1201 W. Peachtree Street
Atlanta, Georgia 30309
Telephone:    404-881-4100
Facsimile:    404-881-4111

127729                                            18

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

|  |  |  |
|---|---|---|
| OFS FITEL, LLC, and | ) | |
| OFS BRIGHTWAVE, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | FILE NO. _____ |
| | ) | |
| EPSTEIN, BECKER AND GREEN, | ) | |
| P.C. | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF NANCY RAFUSE

STATE OF GEORGIA
COUNTY OF FULTON

Personally appeared before me, the undersigned officer, duly authorized to administer oaths, Nancy Rafuse, who having been sworn, does depose and state as follows:

1.

My name is Nancy Rafuse. I am a member of the State Bar of Georgia and I have continuously practiced in the field of employment law and litigation based in the State of Georgia for more than 14 years. I have reviewed the Plaintiffs' complaint and other selected information I deemed necessary and appropriate to

105649

form an understanding of the legal work undertaken and performed by the Defendant at the request of and for the benefit of the Plaintiffs in connection with their November 2001 purchase of certain business assets from Lucent Technologies. I make this affidavit for filing with the complaint in this case pursuant to O.C.G.A § 9-11-9.1

2.

I am a graduate of the University of Georgia and the University of Georgia School of Law, where I served as a notes editor for the University of Georgia Law Review. I graduated magna cum laude in 1991 and am a member of the Order of the Coif. Since graduation from law school, I have continuously engaged in the practice of employment law and litigation, first as an associate and later as a partner in the 800-lawyer national firm Paul, Hastings, Janofsky & Walker, and, since 2003, as managing partner of the Atlanta-based law firm Ashe, Rafuse & Hill, LLP.

3.

I have extensive professional experience representing employers in employment law and litigation matters in Georgia and in other jurisdictions, including providing advice to clients on employment law issues in, inter alia, multi-jurisdictional business transactions and defending employers in collective actions under the Age Discrimination in Employment Act ("ADEA"), the Family

and Medical Leave Act ("FMLA") and the Fair Labor Standards Act ("FLSA"). I also have defended employers in alleged class actions pursuant to Titles II, VI and VII of the Civil Rights Act of 1964, the ADA, and Section 1981. Based on my professional training and experience, I am familiar with the standards of skill, care and diligence normally possessed and applied by lawyers who undertake to counsel employers in Georgia on employment law issues of the sort Defendant undertook in this case.

4.

I have assumed that the factual allegations of Plaintiffs' complaint are true. I have also reviewed the Defendant's itemized bills to Plaintiffs detailing the work performed by Defendant (attached as Exhibit A) and I have assumed that the information conveyed in these itemized bills is also true. From these sources, I take the following facts to be true:

(a)     In July 2001, Plaintiffs' predecessor in interest and its joint-venture partner, CommScope, entered into a contract to purchase certain business assets from Lucent Technologies for approximately $2.5 billion. A key asset was Lucent's skilled workforce, including several hundred managerial employees based in Norcross, Georgia.

(b)     Defendant undertook the professional responsibility to provide advice on labor, employment and benefits issues arising in this transaction.

When CommScope's deteriorating financial position in the wake of September 11, 2001 made it financially incapable of performing its role as a joint venture partner, Defendant, being aware of Plaintiffs' lack of knowledge or experience in U.S. business operations generally and employment law in particular, assured Plaintiffs in writing that Defendant was "prepared to provide whatever advice and resources necessary" and to give diligent "attention to the business and operating practicalities" Plaintiffs would face by proceeding with the transaction without benefit of a U.S.-seasoned joint venture partner. Defendant billed and received more than $1.4 million from Plaintiffs for its legal services.

(c)     The Lucent managerial workforce Plaintiff hoped to acquire had been promised various fringe benefits by Lucent, including severance benefits that increased with length of service and a voluntary early retirement option ("VRO") for workers whose age plus years of Lucent service made them service pension eligible ("SPE").

(d) Among the professional responsibilities Defendant undertook during the course of this engagement was to evaluate and to advise Plaintiff on whether it would be legally permissible to give younger workers credit for prior Lucent service when extending certain benefits (specifically, severance), but to deny that same credit to older SPE workers who, by

reason of age and years of service, were entitled to claim the VRO. Persons working on the transaction referred to this question as the "double dip" issue.

(e)     According to its itemized bills, Defendant researched the age discrimination implications of the "double dip" issue. Defendant provided advice about and assisted with preparation of information to be circulated among employees in a question and answer format (the "Q's & A's") explaining how the transition in ownership would affect the benefits available to managerial employees.

(f)     The initial Q's & A's on the "double dip" issue were communicated to Lucent's management employees through the memo attached as Exhibit B.

(g)     A subsequent version of Q's & A's covering a variety of workforce transition subjects was posted on the Lucent intranet website and attached as Exhibit C. Based on Defendant's advice, Lucent employees were informed:

Q:     (OFS) If I stay with OFS Brightwave or OFS Fitel, will my years of service be transferred to the new company?

A:     For management employees, service recognition is based on whether or not an individual is able to commence a pension. If a person's pension commences, then years of service will begin day one with the new company. If a person's pension does not

> commence, then service time will be transferred to the new company.

Exhibit C at 21 of 26.

(h)    In November, 2001, Defendant drafted separate "offer letters" for non-SPE and SPE managerial employees (Exhibits D-1 and D-2, respectively) that contemplate disparate treatment when extending credit for prior years of Lucent service for severance and paid vacation.

(i)    Defendant failed to advise Plaintiffs of the legal risk inherent in the course of action outlined in Exhibits "B", "C", "D-1" and "D-2". Defendant further failed to advise Plaintiffs of the potential legal consequences of committing an ADEA violation.

(j)    When Plaintiffs proceeded to act in accordance with the course of action outlined in Exhibits "A", "B","D-1" and "D-2" by denying credit for prior Lucent service to older workers for severance purposes, Plaintiffs were exposed to claims and a collective action under ADEA which proved difficult to defend and expensive to settle.

5.

The standard of care applicable to lawyers practicing employment law in Georgia and providing advice on federal law questions under the ADEA requires that the lawyer formulate informed professional judgment and provide thorough

and accurate advice appropriate to each client, informing the client of the

consequences and potential risks of following (or not) the advice and honestly and

faithfully providing services to the client in accordance with the ethical standards

of the legal profession. In my opinion, Defendant did not meet this standard of

care. Specifically, Defendant departed from the applicable standard of care in the

following respects:

    (a)    failing to advise Plaintiffs of the ADEA violation, or risk thereof,

           inherent in its approach to the double dip issue.

    (b)    preparing Q's and A's announcing a policy of disparate treatment that,

           on its face, appears to violate the ADEA without warning Plaintiffs of

           the legal risk.

    (c)    drafting separate "offer letters" contemplating disparate treatment for

           older workers without advising Plaintiffs of the legal risks associated

           with the apparent ADEA violation.

6.

In my opinion, the negligent acts and omissions of Defendant described

above constitute a departure from that degree of skill, care and diligence

commonly possessed and exercised by lawyers in Georgia under similar

circumstances.

# FURTHER AFFIANT SAYETH NAUGHT

Nancy Rafuse

Sworn to and subscribed before me
This _____ day of _____, 2005

Notary Public
My commission expires: _10.06.07_

8

# EPSTEIN BECKER & GREEN, P.C.

### ATTORNEYS AT LAW
### 250 PARK AVENUE
### NEW YORK, NEW YORK 10177-1211

(212) 351-4500
FAX (212) 661-0989
www.ebglaw.com

DIRECT:

212-351-4591

HPIANKO@EBGLAW.COM

October 19, 2001

1227 25TH STREET N.W.
WASHINGTON, D.C. 20037-1175
(202) 861-0900

1875 CENTURY PARK EAST
LOS ANGELES, CALIFORNIA 90067-2506
(310) 556-8861

ONE LANDMARK SQUARE
STAMFORD, CONNECTICUT 06901-2681
(203) 246-3737

TWO GATEWAY CENTER
NEWARK, NEW JERSEY 07102-5330
(973) 642-1900

75 STATE STREET
BOSTON, MASSACHUSETTS 02109-1813
(617) 342-4000

TWO EMBARCADERO CENTER
SAN FRANCISCO, CALIFORNIA 94111-3994
(415) 398-3500

12750 MERIT DRIVE
DALLAS, TEXAS 75251-1219
(972) 628-2480

150 N. MICHIGAN AVENUE
CHICAGO, ILLINOIS 60601-7553
(312) 499-1400

3399 PEACHTREE ROAD N.E.
ATLANTA, GEORGIA 30326-2834
(404) 812-5660

Junji Masuda, Esq.
Masuda & Ejiri
399 Park Avenue
New York, NY 10022

Re: Invoice Nos. 383085 and 382979

Dear Mr. Masuda:

Enclosed are our invoices for services rendered through September 28, 2001 with respect to the Lucent Technologies transaction, both with respect to the overall employment and benefit considerations and the work done on specific benefit plans.

If you have any questions or comments feel free to contact me or Ron.

cc:  Ronald M. Green, Esq.
Evan Spelfogel, Esq.
Allen B. Roberts, Esq.

Very truly yours,

Howard Pianko

HP:cc

NY:165999.1

# EPSTEIN BECKER & GREEN, P.C.

250 PARK AVENUE
NEW YORK, NEW YORK 10177-1211
(212) 351-4500

FED. ID. NO. 13-3031033

The Furukawa Electric Co., Ltd.
c/o Masuda & Ejiri
399 Park Avenue – 18th floor
New York, NY 10022
Attn: Junji Masuda, Esq.

Invoice No. 383085
Invoice No. 382979

through September 28, 2001

Overall Employment and Benefit Considerations ................$173,939.82

Specific Benefit Plans ......................................$74,973.15

**TOTAL AMOUNT DUE $248,912.97**

Wire Instructions

Chase Manhattan Bank N.A.
1166 Avenue of the Americas, 15th Floor
New York, NY 10036
ABA# 021000021
For further credit of Epstein Becker & Green P.C.
#033-1-259234

NY:170504.1

# EPSTEIN BECKER & GREEN, P.C.
### ATTORNEYS AT LAW
250 PARK AVENUE
NEW YORK, NEW YORK 10177-0077

(212) 351-4500
FAX (212) 661-0989
FED. I.D. NO. 13-3031033

October 31, 2001
Invoice #: 382979

The Furukawa Electric Co., Ltd.
c/o Masuda & Ejiri
399 Park Avenue - 18th Floor
New York, NY 10022
Attn: Junji Masuda, Esq.

---

For Professional Services rendered through the period ending 09/28/01:

04770-00002
.quisition

Legal services rendered as itemized in the attached detailed billing report.

| | | | |
|---|---|---|---:|
| Attorney time: | 401.40 hours | $ | 168,498.00 |
| Disbursements | | $ | 5,441.82 |
| **Total This Invoice** | | **$** | **173,939.82** |
| | | | |
| Prior Balance | | $ | 318,374.93 |
| Current Charges | | $ | 173,939.82 |
| **Total Amount Due** | | **$** | **492,314.75** |

PLEASE INCLUDE INVOICE NUMBER 382979 ON YOUR CHECK